**SO ORDERED.**

**SIGNED this 25th day of August, 2016.**



Janice Miller Karlin
United States Chief Bankruptcy Judge

---

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF KANSAS

In re:
Lawrence Michael O'Brien,                    Case No.  15-21184
                                             Chapter 7

                     Debtor.

_____

First National Bank of Omaha,

                     Plaintiff,
v.                                           Adversary No. 15-6089

Lawrence Michael O'Brien,

                     Defendant.

_____

## Memorandum Opinion and Order

First National Bank of Omaha ("FNBO") asks the Court to find its judgment

against Defendant/Debtor Lawrence Michael O'Brien ("Debtor") nondischargeable

under either 11 U.S.C. § 523(a)(2)(A) or (B).[1] It claims that Debtor forged his wife's signature on several loan documents and overstated real property values on two personal financial statements, thereby inducing FNBO to loan money to Debtor's business. The Court enters judgment for Debtor in this adversary proceeding because FNBO failed to carry its burden to prove that Debtor's actions caused its damages under § 523(a)(2)(A) and failed to show under § 523(a)(2)(B) that Debtor used materially false written statements to obtain credit from FNBO.

## I.    Findings of Fact

Debtor and George Young, as co-owners of Superior Acquisition Group, Inc. ("Superior"), purchased La Superior Food Products, Inc., a Mexican food manufacturer located in Shawnee, Kansas, in 2003. Commerce Bank financed Superior's purchase of the business assets while the prior owners of the business, the Porters, financed Superior's purchase of the business real estate. By 2008, Superior's business had deteriorated at least in part due to high gas and corn prices, causing it to default on both loans. Commerce Bank and the Porters obtained judgments against both Superior and the guarantors of the loans, who included Debtor, Young and their respective spouses.

As a result, Debtor and Young began searching for financing not only to satisfy those judgments, but to enable Debtor and his wife to repay a  promissory note they executed in January 2008 for $347,000 to The Private Bank. During  2011, Debtor and

---

[1] *See* Pretrial Order, Doc. 70. In addition, for the remainder of this opinion, all references to Title 11 of the United States Code will be to section number only.

Young entered into negotiations with FNBO for the financing necessary to pay these outstanding debts and to solve Superior's cash flow problems.

Debtor and FNBO executed the first loan agreement in March, 2011. At trial, John Willis, who is now a director in charge of managing the commercial real estate loan portfolio at FNBO, described the loan approval practices used by FNBO in 2011.[2] The loan memorandum for that transaction states that FNBO's extension of a $30,000 line of credit to Superior was "a temporary financing solution to support working capital of La Superior until [the] pending loan request ha[d] been approved and funded."[3]

To secure this bridge loan, Debtor agreed to assign FNBO an interest in a deposit account ("CD") he and his wife jointly maintained at the bank. To consummate that agreement, FNBO required Debtor and Mrs. O'Brien to execute an "Assignment of Deposit Account" ("First Pledge Agreement"), which defined the collateral as "CD Account Number [redacted] 3774 with Lender."[4]

According to the testimony of a highly credible handwriting expert, it is clear that Debtor signed both his name and his wife's name on the First Pledge Agreement

---

2  While Mr. Willis worked at FNBO when the bank made the loans to Superior, he was not the loan officer in charge of documenting or making the loans. Thus, his testimony was not based on personal knowledge of the events as they unfolded but from a subsequent review of the loan documents and a general knowledge of the loan processes then in effect. Because no party elected to call the loan officer who was most familiar with the history and terms of the loans, there are gaps in the evidence regarding the events of 2011.

3  Ex. 53, FNBO 00780.

4  Ex. 3.

for the CD. Mrs. O'Brien testified she did not give Debtor permission to sign her name. Mr. O'Brien testified he had never seen the First Pledge Agreement nor several of the other loan documents admitted at trial, though he admitted the documents contained his signature. Because his memory seemed faulty about his execution of the loan documents—and about the content of those documents and many other details surrounding the 2011 loans, Debtor's testimony was not particularly credible about how and whether loan documents were executed. For that reason, the Court adopts the conclusions of the handwriting expert regarding the signatures on the loan documents. Debtor signed his own name and his wife' name (without her authorization) on the First Pledge Agreement and on two other pledge agreements detailed below.

Mr. Willis also testified that FNBO requires applicants to submit personal financial statements ("PFS"s) to enable it to assess the creditworthiness of loan guarantors—in this case Debtor and George Young. Although the evidence was unclear how or when FNBO came to receive it, the loan file contained a PFS dated November 11, 2009. It seems likely that Debtor and his wife initially provided this PFS to Commerce Bank in conjunction with an attempt to work out that loan default.[5]

The 2009 PFS reflected Debtor's interest in three tracts of real property—his jointly owned residence located in Leawood, Kansas valued at $985,000 and two

_____

5 The November 2009 PFS is on a U.S. Small Business Administration form, and the promissory note attached to the petition for foreclosure on the 2003 Commerce Bank loan is also on an SBA form. Ex. 24, Ex. A. FNBO noted that the $1,125,000 Commerce Bank judgment was not shown on this PFS, but again, it seems clear that this PFS was done during an attempt to work out a deal with Commerce Bank, who was well aware of its own judgment. It is equally clear that FNBO was also aware of the Commerce Bank judgment, as repaying it—along with the Porter judgment—was a primary purpose of the loans.

-4-

properties in Missouri he owned with his wife as tenants by the entirety: one a "rental" property in Kansas City, Missouri valued at $290,000 and the other a "lake home" in Lake Lotawana, Missouri valued at $575,000.[6] Altogether, the PFS approximated that Debtor and his spouse had a net worth of $3,205,100 in November, 2009. Debtor signed his name and his wife's name on the PFS without her permission to do so.

FNBO approved an increase in Superior's line of credit in April, 2011, from $30,000 to $50,000. Similar to the previous loan's approval, Debtor executed an "Assignment of Deposit Account" ("Second Pledge Agreement"), which was identical to the First Pledge Agreement except for increasing FNBO's security interest in the CD from $30,000 to $50,000. Again, Debtor signed both his and his wife's name to the assignment without her authorization.

These lines of credit provided operating capital for Superior during the time FNBO analyzed the creditworthiness of the business and its owners before making the ultimate, much larger loan Superior needed. The ultimate loan was actually three separate financing agreements totaling $1.9M; it closed in May, 2011.

The ultimate loan consisted of a $300,000 line of credit, to mature in twelve months, and two $800,000 term loans, to mature in sixty months (together "the Superior Loans"). Of the $1.9M, $225,481 paid off the Porter judgment, $1,125,000 paid off the Commerce Bank judgment, $319,386 satisfied The Private Bank loan, and

---

6  Ex. 1.

-5-

$43,896 paid off FNBO's bridge loan.[7] The Superior Loans were cross-collateralized and secured by the following:[8]

1. a first mortgage on Superior's business real property that FNBO's loan memorandum indicated had recently been appraised, presumably by it, at $1M;
2. a first lien on Superior's business equipment that had recently been appraised, presumably by FNBO, at $1,678,000;
3. the O'Briens' CD, valued at $100,282;
4. an all-business-asset UCC filing to cover inventory and raw materials that FNBO valued at $166,981; and
5. the guaranties of Debtor and Young, which were not separately valued in the loan memorandum.

Thus, without ever looking to either guaranty, FNBO believed it had over $2.8M in business assets (plus the CD) to secure its $1.9M loan. On page four of its loan memorandum, FNBO then evaluated the expected liquidation value of the collateral in the event of default and concluded there was "Excess Marginal Collateral" of $163,078[9]—again, without attributing any specific monetary value to either guaranty.

FNBO again required Debtor and his wife to sign an agreement pledging the CD as security for all three loans ("Superior Loans Pledge Agreement"). According to the agreement, FNBO could take possession of the CD upon default of any of the three loans. Debtor admitted that the signature on the final page of the Superior Loans Pledge Agreement (dated May 19, 2011) is his, but testified that he never intended to pledge the CD as collateral for the business loans because he believed the CD belonged

---

[7] Ex. 28, (HUD Settlement Statement). The remainder went to pay miscellaneous other charges, including settlement charges described in Ex.28.

[8] Ex. 55. at 01068-01071, including "Summary of Credit Action" and "Collateral Analysis" sections.

[9] *Id.* at FNBO 01071.

exclusively to his wife.[10] In fact, Debtor testified that he's not sure how or when the Superior Loans Pledge Agreement was signed by either himself or his wife, noting his wife was not at the closing for the business loans. He even claimed he had never seen the document prior to his former attorney showing it to him during FNBO's foreclosure action against Superior—sometime in 2013. Again, Debtor was not a credible witness regarding execution of the loan documents.

Conversely, the handwriting expert very credibly testified that it was Debtor's own signature on the Superior Loans Pledge Agreement (compared from a "known"/admitted handwriting sample) and that Gloria's signature was also authentic. In other words, it was not one of the seven documents on which Gloria's signature had been forged by Debtor. As a result, the Court finds both Debtor and his spouse signed this Superior Loans Pledge Agreement, pledging their jointly owned CD as collateral for the Superior Loans.

A month after the Superior Loans were made, in June 2011, Debtor and his wife opened a money market account at FNBO. Shortly thereafter, they transferred the balance of the pledged CD to the newly formed account. Because the CD was security for the Superior Loans, FNBO required Debtor and his wife to execute a fourth Pledge Agreement ("Fourth Pledge Agreement"),[11] pledging the money market account as security for the Superior Loans since it contained the proceeds of the already-pledged

---

10  Contrary to Debtor's testimony, the evidence was clear that the CD and the money market account described below were jointly owned by Debtor and his wife. *See, e.g.,* Ex. 19.

11  Ex. 9.

CD. Debtor admitted signing the Fourth Pledge Agreement for himself and his wife, but claimed he did so without first reading the agreement or getting his wife's authorization.

Based on the credible testimony of the handwriting expert, the Court finds that Debtor signed his own and his wife's signature on the Fourth Pledge Agreement. This agreement gave FNBO the right, upon default, to set off of the entire balance of the account against the amount owed on the Superior Loans, though it only required Debtor and his spouse to maintain a $100,000 balance.

The Court next turns to Debtor's guaranty of the loans. FNBO requires guarantors on business loans to provide an annual PFS for the life of the loan to monitor the risk of its investments. About ten months after the closing on the Superior Loans—in March, 2012—Debtor provided FNBO a second PFS. Unlike the first PFS from November, 2009, this was on a First National Bank form and was handwritten instead of typed. It showed the same three tracts of real estate and stated identical values as the 2009 PFS for the rental and lake properties located in Missouri. And, although FNBO had not requested that the spouses of Debtor or Mr. Young guarantee the loans, the PFS reflected the couple's joint assets and both signatures. Again, the evidence was clear that Debtor signed the March, 2012 PFS for both himself and his wife without her authorization.

The $300,000 line of credit matured one year after its execution, on May 19, 2012, at which time Superior defaulted. Superior's default on the line of credit triggered a default on each of the other two notes. FNBO filed a petition for foreclosure,

-8-

Case 15-06089    Doc# 80    Filed 08/25/16    Page 8 of 23

breach of note, breach of guaranty, and declaratory judgment in state court in September, 2012. In February, 2013, the parties stipulated to entry of judgment against Superior, Debtor, and Young for $1,555,142. FNBO then scheduled a sheriff's sale of the business real estate and entered a successful credit bid of $480,000, representing less than half the $1M value (and only 60% of the $800,000 liquidation value) FNBO had attributed to it at the time it made the Superior Loans in May, 2011. FNBO allowed Superior to privately sell the business equipment for $235,000—approximately one-third of the $792,800 "net" or liquidation value FNBO had used in approving the Superior Loans.[12]

FNBO also set off the Debtor's pledged money market account, crediting Superior the entire balance—approximately $186,000.[13] After the sheriff's sale of the realty, the private sale of the other business assets, and the set off of the entire balance in the money market account, Superior, Debtor, and Mr. Young still owed FNBO $634,521 plus post judgment interest.

Two years later, on June 3, 2015, Debtor filed his Chapter 7 bankruptcy and listed FNBO as an unsecured creditor with a claim for $634,521. On Schedule A, Debtor valued his rental property at $129,000 ($161,000 below the value included on

---

12 The Court heard no evidence that Debtor was the source of the business asset valuations, and FNBO has not alleged (nor presented evidence concerning) any misrepresentation regarding the value of these assets.

13 Debtor and his wife opened the money market account with $75,000 on June 17, 2011 and the balance of the CD—$100,334.51—was deposited into that account on July 11, 2011. On July 27, 2011, Debtor or Mrs. O'Brien deposited an additional $10,052.24 into the account, and an interest payment was credited to the account on July 29, 2011, bringing the total account balance to $185,518.39. *See*, Exs. 73 and 74.

both PFSs) and his lake house at $300,000 ($275,000 below the PFS value). At no time did FNBO ask for or receive a mortgage or deed of trust on these tracts of real property to secure its loans, which Debtor owns with his wife as tenants by the entireties.

## II.    Conclusions of Law

In this adversary proceeding, FNBO seeks a determination that its entire deficiency judgment, plus all accruing interest, is excepted from discharge under § 523(a)(2)(A) or (B), claiming the defaulted loans giving rise to the judgment were obtained through misrepresentations and the use of materially false written statements.[14] An adversary proceeding to determine the dischargeability of a debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction.[15] FNBO bears the burden of proof to establish each element of its claims under § 523(a)(2) by a preponderance of the evidence.[16] Exceptions to discharge are strictly construed in favor of debtors and against objecting creditors.[17]

---

[14]  In the Pretrial Order, both parties stated that one issue of law to be determined at trial was whether Debtor committed actual fraud to induce FNBO to advance loans to Superior. *See*, Doc. 70. However, FNBO did not press the "actual fraud" theory or present any argument on this issue at trial. Accordingly, the Court finds that it has waived this theory for relief. In an abundance of caution, however, the Court notes that even if FNBO had argued that its debt was nondischargeable under § 523(a)(2)(A) due to Debtor's actual fraud (as opposed to the theory it did argue—that Debtor made several misrepresentations), the evidence received would still fail to show that Debtor's alleged fraud proximately caused FNBO's damages.

[15]  28 U.S.C. § 157(b)(1) and § 1334(b).

[16]  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[17]  *Kansas State Bank & Trust Co. v. Vickers (In re Vickers)*, 577 F.2d 683, 687 (10th Cir. 1978) (citing *Gleason v. Thaw*, 236 U.S. 558, 561 (1915)).

## A. Nondischargeability under § 523(a)(2)(A)

FNBO relies on Mrs. O'Brien's forged signatures on the First, Second, and Fourth Pledge Agreements to support its claim that its debt should not be discharged.[18] Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud."[19] To carry its burden, FNBO must show that: "(1) the debtor made a false representation; (2) the debtor intended to deceive the creditor; (3) the creditor relied on the debtor's conduct; (4) the creditor's reliance was justifiable; and (5) the creditor was damaged as a proximate result."[20]

As to the first element, FNBO argues that Debtor misrepresented his wife's

---

18  The Court notes that FNBO did not expressly argue that Debtor forging his wife's signature and allegedly undervaluing the rental and lake properties on his PFSs (as opposed to forging her name on the Pledge Agreements) qualifies as false representations for the purposes of § 523(a)(2)(A). Thus, the Court does not separately analyze those issues in this section, instead addressing them in the next section. However, even if FNBO had argued that § 523(a)(2)(A) also applied to the alleged misrepresentations on the PFSs, the Court finds FNBO would still fail to meet its burden to show that those misrepresentations proximately caused its harm.

19  § 523(a)(2)(A).

20  *Ez Loans of Shawnee v. Hodges (In re Hodges)*, 407 B.R. 415, 419 (Bankr. D. Kan. 2009) (citing *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000)). Again, the Court notes that while FNBO raised the issue of actual fraud in the Pretrial Order, it did not renew this issue at trial by articulating the legal standard under which the Court should analyze the facts to find that Debtor committed actual fraud or by indicating what evidence would support such a claim. *See Husky Int'l Elecs. Inc. v. Ritz*, — U.S. —, 136 S.Ct. 1581, 1586 (2016) (holding that a showing of "actual fraud" under § 523(a)(2)(A) does not require the showing of a false representation). The closest FNBO came was by vaguely suggesting that had it known Debtor had forged his wife's signature, it would essentially have considered him a bad actor and would not have proceeded to make the loans. This theory, if that is what FNBO is arguing, suffers from the same flaw as FNBO's other theories—the asserted "fraud" simply was not the proximate cause of its damages.

-11-

consent—by forging her signature—on three separate documents: the First Pledge Agreement, the Second Pledge Agreement, and the Fourth Pledge Agreement. The only credible testimony supports a finding that Debtor signed his wife's name on each of these agreements, thereby representing her consent to the use of the funds, jointly owned by her, in the CD —and later the money market account—as security for the two lines of credit and the ultimate Superior Loans.[21] As Mrs. O'Brien did not consent to Debtor's execution of these agreements, Debtor's forgery constitutes his false representation that she agreed to pledge the CD as collateral. Thus, FNBO has demonstrated the first element of § 523(a)(2)(A).[22]

The second element requires FNBO to show that Debtor intended to deceive the bank through his false representations, which "'may be inferred from the totality of the circumstances'" as debtors generally do not admit intentional deception.[23] "The bankruptcy court must consider whether the totality of the circumstances 'present a picture of deceptive conduct by the debtor which indicates an intent to deceive the

---

21  *See Bain Estate v. Hammen (In re Hammen)*, 399 B.R. 867, 877 (Bankr. S.D. Iowa 2009) (adopting the handwriting expert's conclusion that the allegedly forged signature was genuine, and finding that the signor therefore consented to the terms of the document); *Am. Inv. Bank v. Clarke (In re Clarke)*, No. 95–1053, 1996 WL 33402695, at *5 (Bankr. S.D. Ga. Jan. 19, 1996) (finding that the debtor "deliberately changed her writing style when signing her husband's name," thereby misrepresenting his consent on loan documents).

22  *See FDIC v. Cerar (In re Cerar)*, 84 B.R. 524, 527 (Bankr. C. D. Ill. 1988) (finding the debt nondischargeable under § 523(a)(2)(A) when the debtor signed his son's signature on the loan document); *Sec. Pac. Fin. Corp. v. Grove (In re Grove)*, 73 B.R. 590, 592 (Bankr. D. Minn. 1987) (finding that the debtor's admitted forgery satisfied the elements of § 523(a)(2)(A)).

23  *Fowler v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir. 1996) (quoting *In re Gans*, 75 B.R. 474, 486 (Bankr. S.D.N.Y. 1987)).

creditor.'"[24] A totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses.[25]

Debtor repeatedly claimed that either he did not forge his wife's signature on various documents, or that he might have, but if he did, he did not intend to deceive FNBO into extending the Superior Loans. As to the CD/money market account, he testified that because it was solely his wife's account and because FNBO never asked her to guarantee the loans, he never intended to pledge it as security for the business loans. He also admitted that his signature appeared on the First and Second Pledge Agreements executed in 2011, but then claimed he had never seen those documents prior to the foreclosure action in 2013. Thus, Debtor simultaneously testified that he effectively consented to the pledge terms by signing the documents[26] but that he did not really understand what he was pledging.

The Court simply did not find Debtor credible regarding the pledge of the CD/money market account. First, the evidence clearly shows this was a joint account, contrary to his testimony that it belonged solely to his wife. Second, the Court finds it most likely that Debtor signed his wife's name to the pledge agreements because FNBO

---

24 *Davis*, 246 B.R. at 652 (quoting 3 NORTON BANKR. LAW & PRACTICE 3D § 57:16 (2016)).

25 *See, e.g., Guinn v. Anderson (In re Anderson)*; 403 B.R. 871, 877 (Bankr. D. Kan. 2009) ("Often credibility based upon the court's observation of witness demeanor plays a significant role in determining dischargeability.").

26 *See Liggatt v. Employers Mut. Cas. Co.*, 273 Kan. 915, 921, 46 P.3d 1120, 1125 (2002) ("A party to a contract has a duty to read the contract before signing it, and the failure to read a contract does not make the contract less binding."); *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 299, 736 P.2d 888, 892 (1987) ("[A] person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms.").

-13-

required the CD as security for the two bridge loans and the Superior Loan—loans Superior desperately needed. Superior and Debtor—and his wife, Gloria, for that matter—faced two judgments exceeding $1,350,000 and a potential foreclosure of the business, which was the main source of Debtor's income. The Court finds that Debtor understood that FNBO required the pledge of the CD/money market and that he willingly executed the Pledge Agreements to preserve the business and his livelihood.

Debtor also freely admitted he forged his wife's signature on the Fourth Pledge Agreement, quibbling instead about the timing of the agreement—executed a month after FNBO distributed the proceeds—and the unfairness of FNBO requiring the asset as collateral. While the Fourth Pledge Agreement was not executed until after the Superior Loans were distributed, the money market account clearly contained the funds from the CD that had been pledged contemporaneously with the closing of those loans. Accordingly, Debtor's intentional and knowing representation that his wife consented to the use of their joint account as replacement collateral for the Superior Loans when she claims she did not so consent certainly paints a picture of deceptive conduct. The Court thus finds that Debtor intended to deceive FNBO by forging his wife's signature on the First, Second and Fourth Pledge Agreements and thereby pledging the accounts as security without his wife's authorization.[27] The second element of § 523(a)(2)(A) is satisfied.

FNBO relied on Debtor's representation that both owners of the account

---

[27] *See Clarke*, 1996 WL 33402695, at *5.

consented to its use as security for the lines of credit and the Superior Loans. Mr. Willis credibly testified that FNBO was willing to extend both the $30,000 and the $50,000 lines of credit because its investment was wholly secured by the CD. According to Mr. Willis, FNBO would not have extended the initial lines of credit without the CD as collateral. Of course, for the assignment to FNBO to be enforceable, it had to be signed by both Debtor and Mrs. O'Brien since they were joint owners of the account. Additionally, the loan memoranda used by FNBO in its approval process identified the CD as the primary source of repayment should Superior default on these two short-term loans.[28]

After Debtor and his wife transferred the CD to the money market account, FNBO relied on Debtor's representation that both account owners still agreed that the balance would continue to secure the Superior Loans. According to Mr. Willis, FNBO would not have extended any credit to Superior if it had known that Mrs. O'Brien did not consent to the use of the CD or money market account as security. FNBO's reliance on the forged documents therefore satisfies the third element of the § 523(a)(2)(A) test.

The Court next turns to element four of the § 523(a)(2)(A) analysis—whether FNBO's reliance on Debtor's misrepresentations was justifiable "from a subjective standpoint."[29] This inquiry is fact-intensive and based on the "qualities and

---

28  FNBO's loan memoranda distinguish between each of the loans and what collateral served to secure them. *See* Ex. 53, 54, and 55. A review of the memoranda for the first two bridge loans makes clear that the only collateral securing those loans was Debtor's CD.

29  *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791–92 (10th Cir. 2009) (citing *Field v. Mans*, 516 U.S. 89, 74–75 (1996)).

-15-

characteristics of the particular plaintiff,"[30] though reasonableness is by no means irrelevant.[31] It was imminently reasonable for FNBO to rely on Mrs. O'Brien's consent to use the jointly owned CD to secure the first two lines of credit because the CD fully secured each of those two loans, was highly liquid, was the only collateral securing those loans, and was owned jointly by the O'Briens and therefore could only be pledged with the consent of both.

In response, Debtor again argues that because the Fourth Pledge Agreement was not signed until after the $1.9M loan funds had already been disbursed, FNBO could not have relied on it to make the loan.[32] FNBO did, however, rely on Debtor's execution of the Fourth Pledge Agreement to maintain its relationship with Superior and its owners and continue to fulfill its obligations under the Superior Loans.[33] Thus, FNBO justifiably relied on the pledge of the CD funds—which Debtor elected to transfer to a money market account—to continue to secure the Superior Loans. The fourth element of the § 523(a)(2)(A) test is therefore satisfied.

The fifth and final element that the plaintiff must prove under § 523(a)(2)(A)

---

30 *Field*, 516 U.S. at 71.

31 *Id.* at 76.

32 *See* 4 COLLIER ON BANKRUPTCY ¶ 523.08 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("If the property or services were obtained before the making of any false representation, subsequent misrepresentations will have no effect on dischargeability.").

33 *See, generally Field*, 157 F.3d at 45–46 (holding that forbearance of rights under a contract constitutes 'renewal' or 'extension' of credit under §523(a)(2)(A)); *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 69 (1st Cir. 2012) (holding that a misrepresentation after a services contract was signed can still be the cause of a creditor's harm under § 523(a)(2)(A)).

-16-

is that it suffered damage as a proximate result of the debtor's misrepresentation—a concept also known as causation.[34] Causation is split into two parts, both of which must be proven to find that the defendant caused the plaintiff's harm. The first part is cause-in-fact (also known as 'but for' cause), "which means that [the debtor's] misrepresentations must have 'played a substantial part,' and so were 'a substantial factor,' in affecting [the creditor's] 'course of conduct that result[ed] in his loss.'"[35] Showing cause-in-fact is fairly straightforward: a plaintiff must show that, but for a defendant's action, the plaintiff would not have been harmed.

Here, Mr. Willis testified that but for the pledges of the CD/money market account, FNBO would not have extended any loans to—or continued its working relationship with—Superior and therefore would not have been harmed by Superior's failure to pay. Mrs. O'Brien's consent was a "substantial factor" inducing FNBO to lend to Superior.

The Court does not, however, find that Debtor's forgeries proximately caused the harm claimed by FNBO. Proximate cause—or "legal causation"—"is largely a question of foreseeability."[36] In other words, "[a] fraudulent misrepresentation" is the proximate cause of a loss "if, but only if, the loss might reasonably be expected to result from the

---

34  *See In re Hodges*, 407 B.R. at 419; *In re Goguen*, 691 F.3d at 69; *Sanchez v. Lovato (In re Lovato)*, 442 B.R. 810, 814–15 (Bankr. D.N.M. 2011) ("One element of a section 523(a)(2)(A) claims [sic] is the proof that the debtor's representation *caused* the creditor to sustain a loss.") (emphasis in original) (citing *In re Young*, 91 F.3d at 1373).

35  *In re Goguen*, 691 F.3d at 67 (quoting RESTATEMENT (SECOND) OF TORTS § 546, cmt. b. (1977)).

36  *In re Goguen*, 691 F.3d at 70.

reliance."[37] Generally, it is reasonably foreseeable that FNBO could be damaged by relying on a forged signature in a pledge agreement. But was it actually damaged *here* by the forgeries, and if so, in what amount?

FNBO asks this Court to hold that the entire amount of its remaining judgment was caused by Debtor's misrepresentations that his wife consented to a $100,251 pledge of their jointly owned CD. But because the CD was held (ultimately as a money market account) at FNBO, FNBO controlled and was thus able to (and did) set off the entire balance contained in that account when Superior defaulted on the loan. Because FNBO thus received the full benefit of the pledge, notwithstanding the misrepresentations, none of FNBO's remaining loss was caused by those misrepresentations about Mrs. O'Brien's consent to pledge that account.[38]

It is also important to note that FNBO presented no evidence that Debtor misrepresented the value of any other asset pledged as collateral. When FNBO entered into the loan agreements with Superior, it received, as security for repayment, the value of Superior's assets, the balance in the CD, and the personal guaranties of Debtor

---

37 RESTATEMENT (SECOND) OF TORTS § 548A (1977).

38  During pretrial proceedings, the parties referenced a pending state court action between FNBO and Mrs. O'Brien by referring to a trial setting in September, 2016. To the extent Mrs. O'Brien is alleging that FNBO was not entitled to set off the money market account (because her signature on it was forged, or for any other reason), and if she ultimately receives a judgment against FNBO holding that any part of that account should not have been set off, any amount of that account that FNBO would be required to repay to her *would* likely be a loss caused by Debtor's misrepresentation. In that event, FNBO might be entitled to timely seek reconsideration of that part of this decision holding that FNBO was not damaged by Debtor's misrepresentations as "newly discovered evidence" under Fed. R. Civ. P. 60(b)(2), as incorporated into bankruptcy proceedings by Fed. R. Bankr. P. 9024.

-18-

and Mr. Young. Its loan memorandum for the Superior Loans clearly indicate that the bank appraised the business assets prior to extending $1.9M and found those assets to be worth far more than the debt to be owed. Even its conservative liquidation analysis showed "Excess Marginal Collateral" without reference to the personal guaranties. This may well have been why it did not require either spouse to guarantee the loan (as Commerce Bank had required), and why it did not require O'Brien to pledge any of his three pieces of real estate as collateral or Young to pledge his $800,000 residence.

When Superior defaulted on its obligations, FNBO sold (or set off in the case of the CD) every item of collateral it had bargained for. As it turns out, none of the pledged collateral (except for the CD) returned the value FNBO had predicted when making the loan. FNBO presented no evidence that Debtor was the cause of the decline in the value of the pledged collateral, and makes no such argument. FNBO wholly failed to connect the forged documents to this loss of value.

For these reasons, the Court finds that the cause of FNBO's loss was something other than Debtor's forgeries. Perhaps it was the bank's decision not to more fully collateralize the Superior Loans or perhaps it was that Superior was just a bad business. Whatever the real cause, FNBO has not demonstrated that Debtor's forgery was the proximate cause of its damages. Accordingly, FNBO has failed to prove the fifth element of the § 523(a)(2)(A) test. Because FNBO must prove all five elements of § 523(a)(2)(A) before this Court can find its debt nondischargeable, its failure to meet the final causation element requires this Court to find that FNBO has not

-19-

demonstrated its debt should be excepted from discharge due to Debtor's false representations.[39]

## B. Nondischargeability under § 523(a)(2)(B)

FNBO also contends its remaining loan balance should be held nondischargeable under § 523(a)(2)(B). That subsection excepts from discharge a debt "for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's . . . condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."[40]

To satisfy the first element of § 523(a)(2)(B), a financial statement must contain "'an omission, concealment or understatement as to any of the debtor's material liabilities,'" and "'paint an untruthful picture of the debtor's financial condition in such a light which would normally affect the decision on the part of the creditor to grant credit.'"[41] FNBO relies on two purported falsehoods[42] surrounding the PFSs submitted

---

39 *See* § 523(a)(2)(A).

40 § 523(a)(2)(B).

41 *In re Watson*, 2003 WL 21241702, *3 (10th Cir. BAP May 29, 2003) (quoting *Red Oak Branch of Farmers State Bank v. White (In re White)*, 167 B.R. 977, 979 (Bankr. E.D. Okla. 1994) (internal citations omitted)).

42 As noted above, there was also mention that the November 2009 PFS on the SBA form failed to disclose the existing judgments to Commerce Bank and the Porters. Because Commerce, FNBO, and Debtor were all well aware of those judgments at the time FNBO was deciding whether to make a loan to take out those judgments—in fact that was the main reason for the loan—FNBO did not argue this as an actionable false statement. This omission could not have negatively impacted FNBO's decision to grant credit.

-20-

by Debtor. The first is the bank's contention that Debtor forged his wife's signature on both PFSs, and the second is its contention that Debtor intentionally overestimated the value of his rental and lake houses to inflate his net worth.

Mr. Willis testified at trial that FNBO required PFSs from any person guaranteeing a loan in order to review and assess the creditworthiness of the borrower. He explained that when a guarantor has a healthy PFS, the guarantor is more likely to be able to inject cash into a business if it is having trouble making note payments. Clearly, the overall personal financial position of Debtor and Mr. Young was material to FNBO's decision to approve the $1.9M loans to Superior, given they were both owners of the company and guarantors on the loans. But FNBO failed to demonstrate how Mrs. O'Brien's signature on the 2009 PFS (let alone the 2012 PFS made months after credit was extended) was material in its decision to extend credit to Superior (or related to its ultimate losses) given she was not a guarantor on any of the loans nor was she a principal or agent of the business.

In fact, Mrs. O'Brien was not even mentioned in the loan memoranda, including where Debtor's and Mr. Young's PFS were catalogued under "Monitoring." Mr. Willis was the only witness employed by the bank to testify, and he did not provide an adequate explanation why her signature on the PFS was material to FNBO's decision to approve the loans. As there is no evidence that Mrs. O'Brien's approval of—or consent to—the information contained within the PFSs was material to FNBO's decision to loan money or continue its relationship with Superior, the Court finds that FNBO has failed to carry its burden under § 523(a)(2)(B)(i) to show that Debtor's

-21-

forgery on either PFS was a materially false statement.

The second allegedly false statement fares no better. FNBO claims that Debtor overstated the value of both the rental and lake house when he submitted—in 2011—the 2009 PFS with the loan applications and again in 2012 when he submitted the PFS that FNBO requires guarantors provide annually. It is not clear to the Court, however, whether FNBO argues that Debtor *over*valued the rental and lake properties on his PFSs—as alluded to in FNBO's trial brief—or whether it argues that Debtor *under*valued the properties on his bankruptcy schedules—as alluded to by the bank officer's testimony at trial.

Mr. Willis testified that he was generally familiar with the real estate market where the properties were located and that, in his opinion, the values Debtor included on bankruptcy Schedule A–Real Property (filed June 3, 2015) seemed "low" in light of the location and current supply of similar housing (at least for the lake property). However, FNBO elected to present no evidence of the values of those properties at the time the PFSs were signed in 2009 and 2012 or the present values of those tracts.[43] Thus, the Court has no factual basis to conclude, and thus cannot find, that the values stated for the rental and lake properties on Debtor's PFSs were overstated (or are understated on Schedule A, for that matter). FNBO has wholly failed to carry its

---

[43] FNBO apparently did not require or obtain appraisals of any of the three tracts of real estate contained on Debtor's PFS when it approved the loans, as contrasted to the appraisals it required and obtained for the business real estate and equipment. *See* Exs. 53, 54, and 55. This is further evidence that FNBO's lending decisions were not materially based on the values shown for those personally owned properties.

burden under § 523(a)(2)(B)(i) to show that the values listed were materially false.[44]

## III.  Conclusion

Because FNBO has failed to carry its burdens of proof, it is not entitled to judgment under either subsection (A) or (B) of § 523(a)(2). Therefore, the Court will enter judgment for Debtor in this adversary proceeding finding that the FNBO debt is discharged.[45]

**IT IS SO ORDERED.**

###

---

44  Although not a basis for this decision, the Court also notes that FNBO elected not to take a deed of trust on either of these Missouri properties (or a mortgage on Debtors' home) to secure its loans, which lessened its ability in any event to show that the value differential was material in its decision to loan money. The main bankruptcy file also demonstrates that FNBO did not object when Debtor elected to exempt on Schedule C not only his home, but these additional two tracts of non-homestead real estate. This could tend to support Debtor's contention that FNBO never intended to look to these tracts of real estate as security for the loans to Superior, thus eliminating the materiality element.

45  The Court also denies, for the record, both parties' motions in limine. *See* Docs. 75 (FNBO's Motion) and 76 (Debtor's Motion). The Court considered both motions before the presentation of any evidence and decided that, as the trial was to the Court and thus the potential for allowing a jury to hear inadmissible evidence was nonexistent, it would prefer to consider any objections to evidence or testimony contemporaneously with the offered evidence. The Court considered and ruled on each evidentiary objection as it was raised, and thus denies both motions in limine as moot.